# EXHIBIT B

IN THE UNITED STATES COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALIM MUHOOD ADEM, §<br>Detainee, Guantánamo Bay Naval §<br>Base, Guantánamo Bay, Cuba, §<br> §<br>Petitioner, §<br> §<br>- vs - §<br> §<br>GEORGE W. BUSH, President §<br>Of the United States of America, §<br>DONALD RUMSFELD, §<br>Secretary of Defense, and §<br>ARMY BRIG. GEN. JAY HOOD, §<br>Commander, Joint Task Force – §<br>GTMO, Guantánamo Bay Naval §<br>Station, Guantánamo Bay, Cuba, §<br> §<br>Respondents. §<br> §<br>All sued in their official capacities. § | Civil Action No. 1:05-CV-00723<br><br>(RWR) |

### DECLARATION OF GITANJALI S. GUTIERREZ

I, Gitanjali S. Gutierrez, declare that the following statements are true to the best of my knowledge, information, and belief:

1. I am an attorney with the Center for Constitutional Rights, and I serve as counsel for several detainees.

2. I met with Mr. Bisher Al-Rawi, a detainee at Guantánamo Bay Naval Station, Guantánamo Bay, Cuba ("Guantánamo") on December 12,

48808

1

2005, to discuss his role in facilitating other detainees' desire for representation.

3. The Department of Defense (DOD) sent my attorney notes from Guantánamo to the secure work facility for habeas counsel in Washington, D.C. I submitted the notes for review by the Privilege Team on January 4, 2006 and received my unclassified notes from the Court Security Office on January 12, 2006.

4. Mr. Al-Rawi is a British resident who speaks English. He has been detained in Guantánamo for over three years. He also understands our legal system and the meaning of a "next friend."

5. I asked Mr. Al-Rawi about the ability of the detainees to access the federal courts or counsel to challenge the legality of their detention and about the relationship between the prisoners.

### Inability to Access the Courts or Legal Counsel

6. Mr. Al-Rawi is aware of the Enemy Combatant Notification (ECN), which provided the address for the United States District Court for the District of Columbia. In his experience, this notification has been meaningless and has not led to many detainees receiving legal assistance. Mr. Al-Rawi speaks English well, and has lived in England for many years, yet he does not have a full understanding of what a petition for a writ of

48808

2

habeas corpus is designed to achieve. He says that others have a far more difficult time understanding what is in the ECN, as it simply does not explain the problems.

7. Because the authorities at Guantanamo have deceived the prisoners so consistently and so often, the prisoners have a hard time believing that writing a simple letter would do anything. Much of the time the letters do not get through to their families, and they have no reason to believe that things would be different here.

8. There was a group of detainees from Afghanistan who sent letters to the district court after getting the ECN asking for help. Mr. Al-Rawi felt that these Afghani detainees thought they may as well try writing a letter, since they had nothing to lose. But the vast majority of the prisoners do not think that writing a letter would do any good. Indeed, Mr. Al-Rawi does not think that any of the Afghanis who wrote has yet seen a lawyer as a result of their letters, and the letters were written months ago. So this makes it seem even less likely that a simply letter will achieve anything.

9. According to Mr. Al-Rawi, the only reason that these letters got written was that one of the Afghan detainees spoke some English. The prisoners there were in a group setting, and the Afghans were able to talk about a course of action. The prisoners discussed the ECN and then wrote

48808

3

their letters as a group during the same time period. This cannot happen in other blocks because the prisoners cannot easily speak as a group to discuss their options for challenging their detention.

10. Mr. Al-Rawi was living on this block with approximately 25 or 30 Afghan detainees when they received the responses back from the district court. According to him, when the detainees received the court's letters of acknowledgment, none of the Afghan detainees knew what they were. The documents were written in English and never translated. Even though they had got a letter from the court, they still did not get to see a lawyer.

11. No military or other personnel were available who could answer questions about the court documents and nothing more ever happened with them. Mr. Al-Rawi believe that very few prisoners tried to contact the court in this manner and none to has actually seen a lawyer to date by writing the court's address.

12. No U.S. personnel are available at the base to answer any detainee's questions about how to obtain a lawyer or what a habeas petition is. Prisoners who have asked to see their "personal representative" many times about the habeas issues have received no response.

48808

13. Mr. Al-Rawi had no recollection of ever seeing a notification from the American Bar Association about the availability of lawyers, or of the detainees discussing this notification.

14. Most detainees only trusted contacting other detainees who had actual habeas lawyers as a means of securing legal representation. This was because the other prisoners had had time to get to know their lawyers, and learn whether they could be trusted. In particular, Mr. Al-Rawi was able to trust his lawyers because they had come recommended by the British lawyer, Gareth Peirce, who had helped him in the past, and who he knew.

15. Mr. Al-Rawi is concerned in general about all of the detainees for whom he has acted as a next friend and conveyed their direct request for a lawyer. Many of the detainees have not been visited by a lawyer yet and do not know if a lawyer is acting on their behalf. Mr. Al-Rawi perceives this delay as having a very negative effect upon the detainees and their potential attitude towards a habeas attorney when an attorney-client meeting is finally held.

### Close Relationship Between the Detainees

16. Mr. Al-Rawi has conveyed the detainees' intentions and desire for legal assistance. He expressly stated that he had a uniform practice with each detainee who has approached him seeking help. He is firm in his

48808

5

understanding that every single one of them wanted an attorney to help them challenge the legality of their detention.

17. Mr. Al-Rawi both passed along these requests and offered to act as a next friend to help these detainees obtain an attorney.

18. When Mr. Al-Rawi gave his attorney authorizations from other detainees, he was conveying "their words, their wishes." He described his role in this process as acting as an interpreter for other detainees because he is from Britain and speaks English and Arabic. Because of the language barriers for other detainees, they reach out to Mr. Al-Rawi to translate their requests for a lawyer into English.

19. Other detainees, including the petitioner in this case, sought help from Mr. Al-Rawi because he actually had an attorney with whom he meets. Indeed, he has met with two attorneys, Mr. Mickum and Mr. Stafford Smith. Both were recommended by Mr. Al-Rawi's lawyer in England. The detainees held out some hope that their translated requests would reach a lawyer who could help them if Mr. Al-Rawi gave the request directly to his lawyer, rather than sending the letter in an abyss by mailing it through the military mail system.

20. One reason Mr. Al-Rawi told the other prisoners that he could help them was that the ECN specifically said he could: The prisoners were

48808

6

told in the ECN that they could have a "friend" file a petition for them. This was the preference for most prisoners, as they did not want to get their families involved (even if their families were in countries where their families would have any means of contacting an American lawyer, and even if their families knew about the notion of "next friends" acting for the prisoners in Guantanamo Bay).

21. The detainees for whom Mr. Al-Rawi acted as a next friend continue to ask him if he has heard back from his lawyer or want to know what is happening with their requests for a lawyer. According to Mr. Al-Rawi, the detainees are starting to believe that it is the habeas lawyers' fault for not meeting them and deep distrust and disillusionment is building.

22. Mr. Al-Rawi emphasized that the relationship between the detainees, and between him and the petitioner in this matter, is an extremely close bond.

23. Mr. Al-Rawi also does not ask "background" questions of other prisoners, in part for cultural reasons and in part for trust reasons. Many Muslim men in Guantanamo avoid asking other detainees about their wives or children because such inquiries are inappropriate or offensive. Interrogators also ask many background questions about the detainees' families, homes, and travel. If another detainee begins to pry into other

48808

7

detainees' pasts, he may be perceived as or suspected of cooperating with interrogators and of being a "snitch."

24.   In Mr. Al-Rawi's experience, detainees will only share personal information about their backgrounds on their own when they are ready. He and other detainees acting as next friends have not sought this information because they do not want to put themselves in a difficult position with interrogators or other detainees by knowing other detainees' personal background.

25.   Mr. Al-Rawi stated emphatically that he was acting in the petitioners' best interest, and in the best interest of every man for whom he was acting as a next friend. In his experience, the detainees are with each other twenty-four hours a day, seven days a week in most camps. They have developed an extremely close bond, one that Mr. Al-Rawi and other detainees describe as perhaps even more intimate and closer than their bond with their immediate families.

26.   The detainees witness each other doing everything: crying, praying, bathing, using the toilet, sleeping, etc. Most detainees' own fathers or wives have not witnessed this. In Mr. Al-Rawi's word, "normal life does not bring human beings into this kind of close, intimate contact."

48808

27.     In Mr. Al-Rawi's experience, when a detainee has any issues arise, the first people he consults for advice are his neighbors on his cell block. This brings the detainees closer to one another and allows them understand each other's habits, views, and values. It is a unique situation – for this period of time, their cell block neighbors are the people the prisoners are the closest to in all of their entire life, closer than their family. He stated that, in fact, the detainees on the cell block are like another family for many of the men.

28.     Mr. Al-Rawi also explained that, unlike in U.S. federal prisons, none of the men at Guantanamo are hardened criminals or people who have been in and out of prisons their entire lives. Rather, many are regular men who suddenly found themselves in this "nightmare." As a result, prison "gangs" and other typical characteristics of a federal prison do not exist. Instead, the men are very supportive and caring for one another through this ordeal. If one detainee has a food treat, for example, he will break it into small pieces and attempt to share it with others through the wire mesh of their cells. Or if a detainee is ill, other men will try to obtain medical attention for him.

29.     The detainees support one another, and Mr. Al-Rawi stated this includes helping another detainee get a lawyer, even though in the past

48808

9

detainees have been punished for helping one another or speaking up for another prisoner. About a month ago, Mr. Al-Rawi himself was recommended for punishment because he wrote a letter in English to prison authorities about another detainee's health and need for medical treatment.

I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 6th day of February, 2006 in New York, New York.

_____
GITANJALI S. GUTIERREZ

48808